**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **WILLIAM D. CHASE,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 13-00077-KD-M** |
| | ) | |
| **ACE HARDWARE CORP.,** | ) | |
| **Defendant.** | ) | |

**ORDER**

This matter is before the Court on Defendant's Motion for Summary Judgment (Docs.
47-49), Plaintiff's Response (Doc. 53), and Defendant's Reply (Doc. 57).   This action stems
from the circumstances of Plaintiff William D. Chase ("Chase")'s termination from employment
with Defendant Ace Hardware Corp. ("Ace").   Specifically, the issue is whether Chase was
terminated because of his age in violation of the *Alabama Age Discrimination in Employment
Act*, Ala. Code § 25-1-21 *et seq*. ("AADEA").[1]

**I.    Facts[2] Regarding Chase's Termination**

Ace operates a retail support center in Loxley, Alabama, that receives and distributes
hardware and building supplies to other Ace retail stores located primarily in Alabama,
Mississippi and Louisiana.   (Doc. 47-6 at 1 (Decltn. LaMont)).   Chase began working at the
Loxley Ace store on September 5, 2000.   (Doc. 53-3 at 3 (Tr. at 9)).   Chase was employed as a
Warehouse Supervisor and his duties included: supervision of a number of warehouse

---

1  This case is here based on diversity jurisdiction, not federal jurisdiction; Chase filed a state law age
discrimination case in state court and Defendant removed the action to this Court.   (Docs. 1, 9, 17).

2  At the summary judgment stage, the facts are taken in the light most favorable to the non-movant. Tipton
v. Bergrohr GMBH–Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992). The "facts, as accepted at the summary
judgment stage of the proceedings, may not be the actual facts of the case." Priester v.. City of Riviera Beach, 208
F.3d 919, 925 n. 3 (11th Cir. 2000).

employees; responsibility for compliance with the company's Attendance Policy ("Policy"); performing his delegated duty to review any attendance corrective action forms with his subordinate employees; and ensuring subordinates signed the corrective action form.

Chase's supervisor was (former) Operations Manager Tom Thayer ("Thayer"). (Doc. 53-2; Doc. 47-7 at 1 (Decltn. Thayer)). Thayer's supervisor was Warehouse Manager Jason Combs ("Combs"). (Doc. 47-5 at 1 (Dep. Ladnier at 95)). Another employee, Tommy Ladnier, was also supervised by Combs. (Id.) Jim Rich is also a Warehouse Manager. (Doc. 47-1 at 11 (Dep. Chase at 84)). Mary LaMont ("LaMont") is Ace's HR Manager at the store. (Doc. 47-6 at 1-2 (Decltn. LaMont)). LaMont reports directly to Retail Support Manager David Milner in Loxley, Alabama (but not to Thayer, Ladnier, or Combs). (Id.) LaMont enforces and oversees the enforcement of Ace's employment policies at the Loxley store. (Id.)

Ace's employee Policy has been in effect since July 1, 2008. (Doc. 47-1 at 17; Doc. 53-3 at 3 (Tr. at 9)). The Policy provides for progressive discipline for unacceptable attendance, including unexcused absences, reporting for work late or leaving work early, and exceeding the 30-minute meal break. (Doc. 47-6 at 2 (Decltn. LaMont)). Progressive discipline steps include a first, second, third and fourth written warnings, which are issued on corrective action forms. (Id.) After the final written warning, the employee is subject to termination for any further attendance policy violations. (Id.) Each written warning is based on the number of points an employee incurs for each unexcused attendance violation, based on the point system generated by Ace's computer system. (Id.) Under the Policy, an employee is assessed .75 points for arriving to work late or leaving work early, or for exceeding the 30 minute meal break; and an employee is assessed 1.25 points for an absence greater than ½ of a

scheduled shift.  (Id.)

When an employee exceeds the allowed number of points due to attendance violations, Payroll Clerk Mike Tysk ("Tysk") generates a corrective action form, which must be approved and signed by HR Manager LaMont.  (Doc. 47-6 at 2-3 (Decltn. LaMont)).  Once signed by LaMont, Tysk delivers the corrective action form to the mailbox of the employee's supervisor.  (Id. at 3 (Decltn. LaMont)).[3]  The employee's supervisor reviews the form with the employee, has the employee sign the form, and returns the form to Tysk.  (Id.)  Supervisors are expected to follow this policy and if a supervisor believes there exists a reason not to issue the corrective action form, the supervisor would need to discuss that with LaMont.  (Id.)

According to Ace's business records, Jerrica Armstrong ("Armstrong")[4] -- a warehouse worker who was supervised by Chase – was hired on July 2, 2012.  (Doc. 47-6 at 4 (Decltn. LaMont)).  Throughout her employment, Armstrong had numerous attendance violations such as clocking-in late from lunch ("MEALMAX") and for work ("LATEIN"), and several unexcused absences from work.  (Id. and Ex. 2 thereto).  Due to her attendance violations, four (4) different corrective action forms were issued for Armstrong, relating to her attendance, as signed by LaMont.  (Doc. 47-6 at 4 (Decltn. LaMont)).  The first form issued for Armstrong's August 30, 2012 attendance violation; the second issued for her October 5, 2012 attendance violation; the third issued for her December 10, 2012 attendance violation; and the fourth – which subjected her to termination -- issued for her December 13, 2012 violation.  (Id. and Exs.

_____

3 Corrective action forms for attendance are only generated by Ace's computer system for attendance violations that have not been previously excused.  (Doc. 47-6 at 3 (Decltn. LaMont)).  Thus, a warehouse supervisor or operations manager could excuse an attendance violation generally within the week the violation occurred and before the work hours for the week were finalized.  (Id.)  An excused attendance violation would not be charged against the employee and would not be included in any corrective action form.  (Id.)  LaMont does not review whether an employee is properly being charged points for attendance violations.  (Id.)

4  Armstrong is the daughter of supervisor Tabathia Kinnaman.  (Doc. 47-6 at 4 (Decltn. LaMont)).

3-6 thereto; Docs. 47-1 at 18-21).

As her supervisor, Chase went over the first and second corrective action forms with Armstrong, explaining the attendance policies with her and letting her know she was "getting very, very close in points and needed to correct it[]" and turned the forms in to HR (c/o Mike Tysk).   (Doc. 47-1 at 1-2 (Dep. Chase at 22-24)).   Chase received the third and fourth corrective action forms from Tysk, who – shortly after December 13, 2012 -- asked Chase to bring them back to him so he could "rewrite it into one[]" and produce "the extended final[.]" (Id. at 2-4 (Dep. Chase at 26-34)).   Chase knew that Step 3 is a final warning and Step 4 is "subject to termination."   (Id.)   Between the December 10th and December 13th violations, Chase met with Tysk, who (in response to Chase trying to save Armstrong's job) suggested "we go back and look at Jerrica's lunches. Those could be reversed by my supervisor, Tom Thayer." (Id. at 4 (Dep. Chase at 35)).   Chase then began to research whether, "if we corrected some meals, because that seemed to be her major problem[]" if it would "be enough to keep her in her job for at least another try under his [Tysk's] suggestion."   (Id.)   Chase did not immediately issue the third and fourth corrective action forms to Armstrong because he was going to talk with his manager Thayer.   (Id. at 5 (Dep. Chase at 36, 49)).   Some time before December 20, 2012, Chase and Thayer discussed a way to maybe salvage Armstrong's job, given Tysk's prior suggestions.   (Id.)   Thayer did not agree to remove any of the absences or anything relating to her attendance issues; they realized that correcting her late lunches would not change the result. (Id. at 5 (Dep. Chase at 49)).

In either the last week of November or on December 20, 2012,[5] Chase and LaMont

_____

    5   Per Chase, the 1½ minute discussion occurred in late November 2012 in passing, coming out of the elevator (not a formal meeting).   (Doc. 47-1 at 6 (Dep. Chase at 54)).   Per LaMont, the discussion occurred on

4

discussed Armstrong at an impromptu meeting at the store. (Doc. 47-6 at 5 (Decltn. LaMont); Doc. 47-2 at 1 (Dep. LaMont at 19)). LaMont told Chase to treat Armstrong like any other employee (no preferential treatment)[6] and that he should terminate her if she had another attendance violation. (Doc. 47-6 at 5 (Decltn. LaMont)). LaMont gave Chase the directive to terminate Armstrong if she had one more attendance violation. (Doc. 47-2 at 1-2 (Dep. LaMont at 19-23; Doc. 53-5 at 5 (Dep. LaMont at 30))).

Chase met with Armstrong on the evening of December 20, 2012, when he went over the third corrective action form with her for over 2 hours, telling her she had violated the attendance policy and listening to her explanations (about her child being hospitalized, etc.) and her offer to improve. (Doc. 47-1 at 5-6, 7 (Dep. Chase at 47, 49, 51-53, 57-58)). Chase told Armstrong that he would go back to Thayer to see if there was anything that could be done. (Id.) Chase had not given Armstrong the third and fourth corrective action forms on December 20, 2012 because she was "subject for termination" and he was going to go back and talk to Thayer one last time. (Id. at 6 (Dep. Chase at 54)). Chase did not see Armstrong again after December 24, 2012. (Id. at 8 (Dep. Chase at 61)). On January 2, 2013, Chase was still discussing saving Armstrong's job with HR Coordinator Peyton Rogers via e-mail. (Doc. 47-1 at 25-27). However, after learning that Armstrong had quit, Chase gathered up all the paperwork and returned it to Tysk, letting Tysk know she had quit. (Doc. 47-1 at 9 (Dep. Chase at 70-72)).

According to Ace's records, after the fourth corrective form was issued for Armstrong, she was absent from work December 14, 26, 27 and 28, and was late to work December 21,

---

December 20, 2012. (Doc. 47-6 at 5 (Decltn. LaMont)).

6 LaMont was concerned that other employees would perceive that Chase gave Armstrong preferential treatment because she was the daughter of another supervisor. (Doc. 47-6 at 5 (Decltn. LaMont)).

2012. (Doc. 47-6 at 5-6 (Decltn. LaMont) and Ex. 2 thereto). Armstrong reported to work December 24, 2012 and January 3-4, 2013. (Id. at 6 (Decltn LaMont)).

On January 3, 2013, Chase transferred Armstrong to a non-standard assignment at the beginning of her shift. (Id.). On January 6, 2013, Chase made notations on Armstrong's time card for January 3rd, depicting that she had been transferred back to her own department (03-Break Stock) at 9:00 a.m. where she worked until 3:31 p.m. (Id. and Exs. 7-8 thereto).

On January 3, 2013, Operations Manager Tom Thayer and Chase had a meeting in Thayer's office to discuss the attendance problems with Armstrong (that she was possibly going to be terminated and to again try to save her employment by excusing any MEALMAX violations). (Doc. 47-3 at 1-2 (Dep. Thayer at 42-43); Doc. 47-3 at 7; Doc. 47-7 at 1-2 (Decltn. Thayer)). Thayer agreed to excuse her late lunches from her absence points total to see if it would save Armstrong's employment. (Doc. 47-3 at 7). On January 4, 2013, HR Coordinator Peyton Rogers told Thayer that removing Armstrong's late lunches would not bring her total down low enough to avoid termination. (Id.) On January 7, 2013, Thayer informed Chase of this result and that Armstrong would need to be terminated. (Id.)

On January 8, 2013, Armstrong resigned from her employment with Ace. (Doc. 47-6 at 4 (Decltn. LaMont)).

On January 9, 2013, Tysk showed LaMont a document printed on January 6, 2013 by Chase which contained Chase's initials next to Armstrong's attendance violations with what appears to be word "approved" next to the violations. (Doc. 47-6 at 7 (Decltn. LaMont)). According to LaMont, this was an attempt by Chase to excuse numerous attendance violations by Armstrong – violations for which Ace had already issued corrective action forms. (Id.)

6

This document also showed that Armstrong had more than 30 attendance violations in less than 6 months of employment yet had not been charged for many of these violations. (Id.) Also on this date, LaMont learned that Chase had failed to issue the third and fourth corrective action forms to Armstrong, in violation of company policy, constituting an act of insubordination making him subject to immediate termination. (Id. at 4-5, 7 (Decltn. LaMont)). LaMont spoke with Thayer, Chase's supervisor, about Chase's attempts to remove attendance violations from Armstrong's record; Thayer stated that he had spoken with Chase and given him permission to remove any MEALMAX violations but nothing else. (Id. at 7 (Decltn. LaMont)). Thayer was unaware of Chase's failure to issue the third and fourth corrective action forms to Armstrong, as well as LaMont's instruction to Chase to terminate Armstrong. (Id. at 8 (Decltn. LaMont); Doc. 47-3 at 8; Doc. 47-7 at 2 (Decltn. Thayer)). On this date, LaMont showed Thayer a computer printout of Armstrong's attendance with Chase's initials next to attendance violations with what appeared to be "approved" next to the violations.

On January 9, 2013, LaMont recommended Chase's termination in a Memo to Chase's Personnel File, and discussed the recommendation with Operations Manager Thayer. (Doc. 47-6 at 8-9 (Decltn. LaMont) and Ex. 9 thereto; Doc. 47-7 at 7-10).

On January 10, 2013, LaMont and Thayer met with Chase (who was then age 62) to discuss his failure to follow the company's Policy (due to his handling of Armstrong's attendance violations) -- there were questions about the timing of the corrective actions issued and his decision making with the main issue being his failure to follow LaMont's directive. (Doc. 47-6 at 9 (Decltn. LaMont); Doc. 47-3 at 8; Doc. 47-7 at 3 (Decltn. Thayer)). LaMont and Thayer met with Chase to give him an opportunity to address: 1) his failure to terminate

Armstrong and treat her like other employees; 2) his failure to charge Armstrong with numerous attendance violations by excusing numerous attendance violations; 3) his failure to review and require Armstrong to sign the third and fourth corrective action forms issued by LaMont; 4) his providing an annotated attendance report that appeared to excuse multiple attendance violations unrelated to MEALMAX violations that Thayer had approved; 5) his discussion of Armstrong's attendance with the Payroll Clerk and HR Coordinator instead of LaMont; and 6) his failure to disclose to Thayer that he had already discussed Armstrong's attendance with LaMont and failure to tell Thayer that he had not issued the third and fourth corrective action forms to Armstrong. (Doc. 47-7 at 3 (Decltn. Thayer)). Ace then terminated Chase's employment for "insubordination" by affording preferential treatment (favoritism) to an employee under his supervision by failing to enforce the company attendance policy as directed by the HR Manager. (Doc. 47-6 at 9 (Decltn. LaMont); Doc. 53-2; Doc. 47-1 at 11 (Dep. Chase at 83-84)).

Ace provided no prior meetings, notice, written warnings, forms, or suspension, before terminating Chase's job. (Doc. 53-7 at 12 (Dep. Ladnier at 70-72)). Chase was fired without a suspension or a suspension pending an investigation. (Doc. 47-1 at 14 (Dep. Chase at 99)).

While Thayer agreed with LaMont's recommendation for terminating Chase, it was the first time a warehouse supervisor had been terminated without a prior written warning or meeting, adding that he would not have terminated an employee over the single issue of failing to terminate Armstrong. (Doc. 47-3 at 2, 4 (Dep. Thayer at 49, 61); Doc. 47-7 at 3 (Decltn. Thayer)). According to Thayer, the previous excused attendance violations alone were not enough to terminate Chase, but his attempt to excuse absences on the computer printout was a serious conduct violation which warranted his termination, and moreover, his other actions "both

alone and together" warranted his termination.    (Doc. 47-7 at 3 (Decltn. Thayer)).

Thayer testified that up to November 2012 (when Ace's protocol changed), Chase was allowed to make changes on attendance violations (for, as example, taking too much time for lunch – mealmax entries) and he "had the ability to do so[]" and Thayer "didn't mind it…because…he had…all the knowledge….I would call Bill anyways…because…the folks don't work for me directly. So he…would need to tell me whether this was excusable or not excused." (Doc. 47-3 at 3 (Dep. Thayer at 57-58)).    However, Thayer testified that Chase trying to change the attendance violations on Armstrong's report, after November 2012, was part of the reason Ace terminated his employment.

Combs testified that Chase was terminated, in part, for insubordination – for not terminating Armstrong after being directed to do so if she acquired one more absence: "[i]t's a portion of the reason."    (Doc. 47-4 at 1 (Dep. Combs at 27-28)).    For Combs, it "was an integrity issue[]" as Chase was "given specific instructions to terminate[]" and "he had gone through the system of playing games and trying to go around the policies[]" for Armstrong.    (Id. at 1-2 (Dep. Combs at 28-29, 43)).

Chase was replaced by either Tabathia Kinnaman and/or Chris Wilson, who were significantly younger than his 62 years (17 and approximately 30 years younger, respectively). (Doc. 47-3 a 5 (Dep. Thayer at 89); Doc. 53-8 at 2 (Dep. Kinnaman at 35-36)).

## II.    Chase's Application for Unemployment Benefits

On January 13, 2013, Chase applied for unemployment compensation benefits with the Alabama Department of Labor ("ADOL").    (Doc. 47-8 at 2).    On January 14, 2013, Chase filed a Charge of Discrimination with the EEOC for age discrimination.    (Doc. 47-6 at 29).

On January 25, 2013, Chase filed a state law action for age discrimination under <u>Ala</u>. <u>Code</u> 25-1-21 against Ace, in the Circuit Court for Baldwin County, Alabama.   (Doc. 1-1; Doc. 53-1).   On February 20, 2013, Ace removed the case to this Court on federal diversity subject matter jurisdiction grounds.   (Doc. 1).

Before March 2013, Chase received notice of a March 2013 hearing regarding the appeal of his partial denial of his unemployment compensation benefits (#01-302-18-13); however, the notice did not inform him that "we would be discussing any issue about age discrimination. I did not advise my attorney of said hearing. I was under the impression, based on the notices from the ADOL, that we would be discussing my right to unemployment benefits and not issues concerning my termination with Ace Hardware."   (Doc. 53-6 (Aff. Chase)).

On February 14, 2013, Chase was mailed his Employer Notice of Determination as to his unemployment compensation benefits -- he was disqualified from receiving benefits from January 6, 2013-February 16, 2013, under <u>Ala</u>. <u>Code</u> § 25-4-78(3)(c) because Ace terminated his employment for misconduct.   (Doc. 47-8 at 1).   Chase appealed the decision.   A telephone hearing before an unemployment compensation administrative hearing officer was held on in March 2013.   The issue was whether Chase was discharged for misconduct connected with the work.   The telephonic hearing was held before Hearing Officer Essence Gable; Ace was represented by counsel and Chase appeared *pro se*.   (Doc. 53-3; Doc. 53-6 at 1 (Aff. Chase)).

At the hearing, Ace presented testimony from witnesses Thayer, LaMont, Tysk and Rogers.   (<u>Id</u>.)   Chase did not present any witnesses, and did not provide much testimony as he said he wanted this attorney to be present.   (<u>Id</u>.)   According to Chase, after the hearing began, it "became clear to him that Ace's counsel was participating in the hearing and that "I might

need to get my lawyer involved in the hearing[]" and so "I advised the hearing officer[r] that I had a lawyer and requested several times to not testify until I had a chance to talk to him." (Doc. 53-6 at 1 (Aff. Chase)).   "I did not litigate or provide any supportive evidence to establish that I was terminated by Ace solely due to my age. The only issue I maintained was that I never had a meeting on December 20th with Mary LaMont."   (Id.)   According to Chase, he did not know there would be any discussion of age discrimination at this hearing and he did not advise his attorney of the hearing.

On March 28, 2013, the ADOL issued its decision, ruling that Chase was terminated for misconduct such that he was partially disqualified from receiving unemployment compensation benefits.   He had until April 12, 2013 within which to appeal this ruling.   (Doc. 47-8 at 4-5). On April 17, 2013, Chase wrote a letter request to appeal the March 2013 ruling (mailed April 20, 2013 and received by the ADOL on April 23, 2013), trying to explain "his compromising position" at the hearing (that he was represented by counsel and so should not have been questioned by Ace's attorney, etc.).   Chase requested the chance to appeal to have his attorney present at a re-hearing on the matter.   (Doc. 47-8 at 6-8).   The State Board of Appeals for the ADOL issued a Transmittal of Decision of the Board of Appeals, dated May 10, 2013, enclosing a copy of the decision and the appeal procedures for same, ruling that Chase's appeal was untimely as not received until April 23, 2013.   (Doc. 47-8 at 9-10).   On April 15, 2013, the EEOC issued a Dismissal and Notice of Rights letter to Chase, stating that the EEOC was closing its file due to the existence of "a prior state court proceeding," and notified him that he had 90 days within which to file a federal claim.   (Doc. 47-6 at 30).

## III.   Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   FED. R. CIV. P. 56(a) (Dec. 2010).   Rule 56(c) provides as follows:

> *(1) Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> *(2) Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>
> *(3) Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.
>
> *(4) Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

FED.R.CIV.P. Rule 56(c) (Dec. 2010).   The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."   Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).   If the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden

of proof," the moving party is entitled to summary judgment.   Celotex, 477 U.S. at 323.   "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.   Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."   Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992) (internal citations and quotations omitted).

## IV.   Discussion

### A.   Motion to Strike: Objection to Affidavit

Ace filed a motion to strike the Affidavit of Justus (Doc. 53-9).   (Doc. 56).   With the 2010 rules change to Rule 56, it no longer appears that motions to strike submitted on summary judgment are appropriate.   Revised Rule 56(c)(2) provides: "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."   FED.R.CIV.P. 56(c)(2).   The Advisory Committee Notes specify:

> Subdivision (c)(2) provides that a party may object that material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. The objection functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated. There is no need to make a separate motion to strike. If the case goes to trial, failure to challenge admissibility at the summary-judgment stage does not forfeit the right to challenge admissibility at trial.

FED.R.CIV.P. Adv. Comm. Notes (2010 Amendments (emphasis added).   As such, the Court construes Ace's motion as an Objection under Rule 56(c)(2).

Due to questions surrounding their veracity -- and because they are primarily based on hearsay and/or Mr. Justus' opinion and "beliefs or feelings" rather than personal knowledge -- the Court has not relied upon either Justus' Affidavit (Doc. 53-9 (Aff. Justus)) or Declaration

(Doc. 56 at 54-58 (Decltn. Justus)) in resolving the motion for summary judgment.   As such, it is **ORDERED** that Ace's Objection is **DENIED** as **MOOT**.

**B.**    **Collateral Estoppel**

The crux of Ace's motion is its affirmative defense of collateral estoppel.   Specifically, Ace contends that Chase is collaterally estopped from claiming that he was discharged due to his age because the ADOL already rendered a final decision that he was terminated for misconduct as part of its unemployment benefits determination.

Under the *Full Faith and Credit Act*, 28 U.S.C. § 1738, federal courts must give a state court judgment preclusive effect if the state's courts would do the same.   As a necessary corollary, federal courts must look to state law to see whether a state court decision will preclude issues or claims brought in federal court.   More specifically, "[a] state court's decision upholding an administrative body's findings has preclusive effect in a subsequent federal court proceeding if: (1) the courts of that state would be bound by the decision; and (2) the state proceedings that produced the decision comported with the requirements of due process." Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999) (citing Kremer v. Chem. Constr. Corp., 456 U.S. 461, 482 (1982)).

In Alabama, for the doctrine of collateral estoppel to apply, the following elements must be established before the resolution of an issue in an earlier proceeding will preclude relitigation in a later one: 1) there is identity of the parties/their privies; 2) there is identity of issues; 3) the parties had an adequate opportunity to litigate the issues in the administrative proceeding; 4) the issues to be estopped were actually litigated and determined in the administrative proceeding; and 5) the findings on the issues to be estopped were necessary to the administrative decision.

See, e.g., Wal-Mart Stores, Inc. v. Smitherman, 743 So. 2d 442, 445 (Ala. 1999), *overruled on other grounds by* Ex parte Rogers, 68 So.3d 773 (Ala. 2010); Lee L. Saad Const. Co., Inc. v. DPF Arch., P.C., 851 So. 2d 507, 520 (Ala. 2002).   "The burden is on the party asserting collateral estoppel to prove that the issue it is seeking to bar was determined in the prior adjudication."   Lee L. Saad, 851 So.2d at 520.

Even assuming all of the other elements have been satisfied, Ace's collateral estoppel argument fails due to the absence of the third element -- whether Chase had an *adequate* opportunity to litigate the issues in the administrative proceeding.   Ace asserts that Chase merely had to have *an* opportunity.   (Doc. 48 at 19).   This is not accurate – he must have been given an adequate opportunity, one that is reasonable, "full and fair."

Specifically, Alabama's Unemployment Compensation Act affords parties an adequate opportunity to litigate the issue of discharge in an unemployment compensation claim hearing. Petty v. United Plating, Inc., 2012 WL 2047532, *12 (N.D. Ala. 2012) (citing Smitherman, 743 So.2d at 446).   But this does not necessarily mean that the mere existence of an unemployment compensation claim hearing equates with an "adequate opportunity."   Rather, the Court must review the hearing to determine whether an adequate opportunity for Chase to litigate the denial of his unemployment compensation benefits existed.   This determination entails an assessment of whether Chase "had a full and fair opportunity to litigate the issue before the ADIR."   See, e.g., Jones v. Hamic, 875 F.Supp.2d 1334, 1349-1350 (M.D. Ala. 2013) (providing "the Court is wary about using the ADIR's findings to preclude…[plaintiff] from contesting the reason for…[his] firing. This is because it is not at all clear that...[plaintiff] had a full and fair opportunity to litigate the issue before the AIDR….[b]ecause the defendants

15

deprived…[plaintiff] of this opportunity [to cross-examine and undermine a witness' testimony]…the Court sees no reason to reward their behavior by estopping…[plaintiff] from relitigating the issue…[]).

In Smitherman, 743 So.2d at 445, the Alabama Supreme Court cited to and relied upon the 11th Circuit's opinion in Pantex Towing Corp. v. Glidewell, 763 F.2d 1241, 1245 (11th Cir. 1985) which cited to and relied upon the U.S. Supreme Court's decision in U.S. v. Utah Const. & Min. Co., 384 U.S. 394, 422 (1966) and the Fifth Circuit's decision in Garner v. Giarrusso, 571 F.2d 1330, 1336-1337 (5th Cir. 1978) and stated:

> ….the result we reach is harmonious with general principles of collateral estoppel…When an administrative agency is acting in a judicial capacity and resolved disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply res judicata to enforce repose….
>
> * * *
>
> ….both parties had a *full and fair opportunity* to argue their version of the facts and an opportunity to seek court review of any adverse findings.

U.S. v. Utah Const. & Min. Co., 384 U.S. 394, 422 (1966) (emphasis added).

> [In Painters District Council No. 38 v. Edewood Contracting Co., 416 F.2d 1081 (5th Cir. 1969)] [w]e held there that a prior determination of the National Labor Relations Board on a liability issue was res judicata in a subsequent damage suit between the same parties where the Board had conducted a *full hearing*, the parties had been represented by counsel, and *both sides had had a full opportunity to present evidence and to cross examine witnesses*… we cautioned that res judicata may apply to some administrative proceedings but not others and that each situation calls for careful examination….Even when the prior decision is made in a judicial, rather than an administrative *forum neither res judicata nor collateral estoppel is rigidly applied. Both defenses must be qualified or rejected when their use would contravene an overriding public policy or result in manifest injustice*…

Garner v. Giarrusso, 571 F.2d 1330, 1336-1337 (5th Cir. 1978) (emphasis added).  See also e.g., Malfatti v. Bank of Am., N.A., 99 So.3d 1221, 1228 at n. 4 (Ala. 2012) (defining one of the collateral estoppel elements to be a "full and fair opportunity" rather than "adequate

opportunity"); <u>Green v. Daughtrey</u>, 926 So.2d 341, 346 (Ala. Civ. App. 2005) (same). See also

<u>Dickinson v. Springhill Hosp., Inc</u>., 397 F.Supp.2d 1337, 1346 (S.D. Ala. 2005) (noting a "full

and fair opportunity" as the fourth element under federal law); 21A FED. PROC., L.ED. § 51:219

(Dec. 2013) (stating that "the federal courts do not apply…issue preclusion if the party against

whom the earlier decision is asserted was not given a full and fair opportunity to litigate the

matter in the earlier proceeding[]").

Additionally, *whether* a party had a "full and fair" opportunity to litigate the issues *may*

be determined by reviewing such non-exclusive factors as: 1) whether the party against whom

collateral estoppel is being asserted lacked the incentive to vigorously litigate in the prior action;

2) the foreseeability of the second action; 3) the size of the claim; 4) the extent of the litigation

and the party's participation in it; 5) the competence of counsel; 6) the availability of new

evidence; 7) the ability of the party against whom collateral estoppel is being asserted to defend

or prosecute the prior action, including any inconvenience due to forum or location; and 8) and

whether the party to be estopped without fault of his own was deprived of crucial evidence or

witnesses in the prior litigation. 47 AM. JUR. 2D JUDGMENTS § 575 (Nov. 2013).

Regarding the hearing procedures, in <u>Smitherman</u>, 743 So.2d at 446, the Alabama

Supreme Court explained that:

> The Unemployment Compensation Act requires that the appeals tribunal "afford[] the
> parties reasonable opportunity for [a] fair hearing." Ala.Code 1975, § 25–4–93. The
> procedure for conducting the hearing is prescribed by regulations of the Department of
> Industrial Relations. *See* [Ala.Code] § 25–4–92(b); *see generally* Ala. Admin. Code r.4.
> 480–1–4–.04 to -.06. Those regulations provide for a hearing at which the parties are
> afforded the opportunity to present evidence and testimony of witnesses given under
> oath. *See* Ala. Admin Code r. 480–1–4–.04. A party may be represented by an attorney.
> *See* [Ala. Admin Code] r. 480–1–4–.05. The parties are also afforded the opportunity to
> request that the hearing officer issue subpoenas to compel the attendance of witnesses or
> the production of documents or other things. *See* [Ala. Admin Code] r. 480–1–4–.06.

17

As to precisely how the hearing is conducted, the Alabama Administrative Code provides, in

relevant part, as follows:

> (1) The proceeding shall be fair and impartial and shall be conducted in such manner as the Hearing Officer may determine to be best suited to determine the rights, duties and obligations of the parties. The order in which evidence is to be presented shall rest within the sound discretion of the Hearing Officer….*The Hearing Officer* may examine any party or witness to the extent deemed necessary and *shall afford all parties every assistance that does not interfere with the discharge of fairness and impartiality*. Hearings shall be confined to evidence relevant and material to the issues involved.

> (2) …. *Those testifying shall be subject to direct and cross-examination by the parties or their representatives and the Hearing Officer.* Documentary evidence may be received in the form of copies or excerpts if the original is not readily available. All parties shall, upon a timely request, be allowed to inspect and use any portion of the records necessary in the presentation of their case.
>
> * * *
>
> (4) The Hearing Officer shall open the hearing by summarizing the issue or issues appearing to be in dispute and prescribing the order in which the hearing will proceed. *The Hearing Officer shall consider and inquire fully into all issues involved regardless of whether the issues were set forth as a ground for appeal and shall receive in evidence the testimony of the parties and witnesses and any documents which are relevant and material to any issue. If new issues arise during the course of a hearing, the Hearing Officer shall apprise the parties that the new issue is being considered, shall explain the newly arisen issue, and inquire as to whether any interested party desires to enter a motion for a continuance.* If no motion is entered, the Hearing Officer shall proceed. If such motion is entered, the Hearing Officer shall rule upon the motion and may, in the exercise of his discretion, continue the hearing to a later time.
>
> * * *
>
> (10) In the hearing of a contested case, the Hearing Officer may announce that it shall not be necessary that objections be made during the hearing and upon such announcement it shall not be required or necessary that objection be made to any testimony or evidence which may be offered by either party and on the consideration of such cases, the Hearing Officer shall consider only such testimony and evidence as is relevant, material, competent and legal, and shall not consider any testimony or evidence which is irrelevant, immaterial, incompetent or illegal, whether objections shall have been made thereto or not, and whether such testimony be brought out on direct, cross or re-direct examination, or is hearsay. On appeal, the court shall consider only such testimony as is relevant material, competent and legal. Neither the Hearing Officer nor the Board of Appeals shall be required to point out what testimony or evidence should be excluded or not considered.

Ala. Admin. Code r. 480-1-4-.04 (emphasis added).    At a minimum then, to be an "adequate opportunity," the Hearing Officer must have complied with these administrative rules.

The record indicates that an unemployment compensation hearing was held, via telephone, regarding Chase's appeal of the denial of his benefits, at which time both Chase and Ace were present.    Chase was not represented by counsel at the hearing even though he had an attorney at that time; he explained that he did not think he needed his attorney present and that he didn't want to answer questions unless his attorney was present.    (Doc. 53-3 at 14).    With this knowledge, the Hearing Officer did not continue the hearing.

Also, Chase's opportunity to cross-examine the witnesses was curtailed.    Specifically, when Chase attempted to ask questions of Ace's witnesses he was told he could not ask the witnesses questions about anything they did not testify to during their direct testimony.    (Doc. 53-3 at 13 (Tr. at 49)).    Thus, he was unable to even question their veracity.    After repeatedly instructing Chase as such, when the Hearing Officer subsequently asked him if he had any questions for any of the witnesses "regarding the testimony" that they gave, it would be understandable if Chase believed that he was not permitted to ask anything further (which appears to have been the case).

Additionally, the Hearing Officer only allowed Chase to testify by way of answering her 17 specific questions – not informing him that he could make his own statement or testify as to whatever he wished to present regarding his entitlement to unemployment benefits.

In sum, the hearing consisted of a direct examination by Ace of its witnesses, with a few questions issued by the Hearing Officer to Chase, and Chase's refusal to testify or provide evidence without his attorney present.

Finally, while Chase appeared *pro se* at the agency level, and this factor is not dispositive, it does militate against a finding of preclusion. See, e.g., Kosakow v. New Rochelle Radiology Assoc., P.C., 274 F.3d 706, 736 (2nd Cir. 2001) (stating that "Kosakow was acting *pro se*…she could not have been expected or able to frame her evidence within the context of the specific legal issues. Nor would she necessarily have known what facts were most relevant or persuasive in proving her case[]").

On balance, the foregoing does not equate with a "full and fair opportunity" for Chase to have litigated, for preclusive effect, the reason for his termination. Rather, the record suggests a finding that: 1) Chase lacked the incentive to vigorously litigate in the prior action because he repeatedly stated he wanted "to wait" to answer and wanted his attorney to be present; 2) Chase minimally participated in the hearing because he did not wish to testify or present evidence without his attorney being present and so refrained from asking questions or providing complete answers and/or evidence; 3) Chase had no "competence of counsel" because he had no counsel with him at the hearing even though the transcript makes clear he wanted his attorney present; and 4) the availability of new evidence is high because Chase did not present any evidence at trial as he wanted his attorney present before doing so.

Because the third collateral estoppel element has not been satisfied by Ace, the Court need not address the doctrine's other elements. Thus, that portion of Ace's motion for summary judgment premised on collateral estoppel is **DENIED.**[7]

---

7  Additionally, the Court finds of interest case law suggesting that collateral estoppel is not permitted in age discrimination cases. Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104, 110-114 (1991) (holding that collateral estoppel does not apply to state administrative decisions where Congress has provided for a detailed administrative remedy such as that found in the ADEA); Jones, 875 F. Supp.2d 1334 (M.D. Ala. 2013) (citing *Astoria* with approval and holding that "[i]f the applicable statute shows that Congress intended to push aside federal preclusion law, the inquiry stops there and the unreviewed agency determination will have no effect[]"); Petty, 2012 WL 2047532 (providing that "[t]he *Astoria* Court held that the filing requirements of the ADEA imply that state

## C.     AADEA: Age Discrimination

## 1.     Relevant Law

Under the AADEA, "[n]o employer, employment agency, or labor organization shall discriminate in employment against a worker 40 years of age and over in hiring, job retention, compensation, or other terms or conditions of employment." Ala. Code § 25-1-21; Lambert v. Mazer Discount Home Ctrs., Inc., 33 So.3d 18, 24 (Ala. Civ. App. 2009).   The AADEA specifically provides that "[a]ny employment practice authorized by the federal Age Discrimination in Employment Act ["ADEA"] shall also be authorized by this article...." Ala. Code § 25-1-29.   The remedies, defenses, and statutes of limitations are the same as those authorized by the ADEA, with the only noted exception being that plaintiffs are not required to pursue an administrative remedy before filing suit.   Id.   The AADEA uses the same analytical framework as the ADEA.   Robinson v. Ala. Cent. Credit Union, 964 So.2d 1225, 1228 (Ala. 2007).   The ADEA makes it unlawful to discriminate against an employee due to his being 40 years of age or older.   29 U.S.C. §§ 623(a)(1), 631(a); Ramsey v. Chrysler First, Inc., 861 F.2d 1541, 1543-1544 (11th Cir. 1988).

A plaintiff may support his claim of age discrimination with either direct or circumstantial evidence.   Pace v. S. Ry. Sys., 701 F.2d 1383, 1388 (11th Cir. 1983).   Where there is only circumstantial evidence, courts apply the framework in McDonnell Douglas Corp.

---

agency findings are not entitled to preclusive effect, and cited three examples in support of that holding…[t]hose provisions 'plainly assume the possibility of federal consideration [of ADEA claims] after state agencies have finished theirs,' and federal proceedings after the conclusion of state proceedings "would be strictly pro forma if state administrative findings were given preclusive effect[]"); Howard v. Steris Corp., 886 F.Supp.2d 1279 (M.D. Ala. 2012) (citing Astoria and recognizing that unreviewed administrative decisions have no preclusive effect over age discrimination claims, adding that Congress likely intended to roll back the general rules of preclusion when it passed the ADEA, reasoning that, "[w]hile the statute contains no express delimitation of the respect owed to state agency findings, its filing requirements make clear that collateral estoppel is not to apply[]").   The Court also notes that the standards governing AADEA cases are usually identical to those established for its federal counterpart – the ADEA.   See, e.g., Taylor v. City of Demopolis, 2005 WL 3320735 (S.D. Ala. 2005).

v. Green, 411 U.S. 792 (1973). See, e.g., Chapman v. AI Transp., 229 F.3d 1012, 1024 (11th Cir. 2000). Under McDonnell Douglas, the plaintiff has the initial burden of establishing a prima facie case of age discrimination. Id. If the plaintiff does so, and the employer articulates a legitimate, nondiscriminatory reason for its actions, the plaintiff must then show that the employer's alleged reason was a pretext for unlawful discrimination. Crawford v. City of Fairburn, 482 F.3d 1305, 1308 (11th Cir. 2007).

To meet his burden of showing a pretext under McDonnell Douglas, the plaintiff must rebut all legitimate non-discriminatory reasons that the employer proffers for the adverse action. Id. A plaintiff can accomplish this by pointing to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's explanation, Brooks v. County Comm'n of Jefferson Cty., Ala., 446 F.3d 1160, 1163 (11th Cir. 2006), and/or by "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence[,]" Kragor v. Takeda Pharm. Am., Inc., 702 F.3d 1304, 1308 (11th Cir. 2012). Additionally, the plaintiff may produce evidence that "permits the jury to reasonably disbelieve the employer's proffered reason." Steger v. Gen. Elec. Co., 318 F.3d 1066, 1079 (11th Cir. 2003). "But a reason cannot ... be 'a pretext *for discrimination* 'unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993) (emphasis in original). The plaintiff "must meet [the] reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." Chapman, 229 F.3d at 1030. The court's inquiry, ultimately, "is limited to whether the employer gave an honest explanation of its behavior." Id. A plaintiff's showing that the

employer was simply incorrect in its decision is insufficient: if the employer honestly believed that the employee engaged in misconduct, even if mistaken, no discrimination exists. Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991).

Further, in Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 176 (2009), the United States Supreme Court held that the language "because of" in the ADEA means that a plaintiff has to prove that age discrimination is the "but for" cause of the adverse act. Following Gross, the Eleventh Circuit reaffirmed the propriety of evaluating ADEA claims based on circumstantial evidence under the McDonnell Douglas framework. See e.g., Mora v. Jackson Mem. Fdtn., Inc., 597 F.3d 1201 (11th Cir. 2010) (explaining that under the ADEA after Gross, an "employer either acted 'because of' the plaintiff's age or it did not[]").[8] However, "it is a long-recognized tenet of tort law that a plaintiff's injury can have multiple 'but-for' causes, each of which may be sufficient to support liability. Requiring proof that a prohibited consideration was the 'but for' cause of an adverse job action does not equate to a burden to show that such consideration was the 'sole' cause….This remains so even after *Gross*. Moreover, a plaintiff is authorized to plead and pursue alternative theories of recovery, even if they are inconsistent…." Bailey v. City of Huntsville, Ala., 2012 WL 2047672, *9 (N.D. Ala. 2012). Thus, Gross does not place a heightened evidentiary requirement on ADEA plaintiffs to prove age was the "sole" cause of the adverse employment action. Pearson v. Lawrence Med. Ctr., 2012 WL 5265774 (N.D. Ala. Oct. 24, 2012); Goodridge v. Siemens Energy, Inc., 276 F.R.D. 540, 542 and n. 1 (N.D. Ala. 2011); Ross v. Renaissance Mont. Hotel & Spa at the Convention Ctr., 2012 WL 1030323, *4-5, *report*

---

8 In Mora the Eleventh Circuit stated that an ADEA plaintiff must now "establish 'but for' causality," such that "no 'same decision' affirmative defense can exist: the employer either acted 'because of' the plaintiff's age or it did not." Id. at 1204 (citing Gross, 557 U.S. at 180). The Eleventh Circuit concluded, it was unnecessary to consider the district court's analysis of the employer's "same decision" affirmative defense. Id. at 1204.

*adopted as modified*, 2012 WL 1032618 (M.D. Ala. Feb. 27, 2012); Archie v. Home–Towne Suites, LLC, 749 F.Supp.2d 1308, 1315 (M.D. Ala. 2010); Freeman v. Koch Foods of Ala., 2010 WL 9461668, *2 (M.D. Ala. Jun. 15, 2010); Collins v. Fulton Cty. Sch. Dist., 2012 WL 7802745, *17-18 (N.D. Ga. Dec. 26, 2012).

However, in Sims v. MVM, Inc., 704 F.3d 1327, 1332-1333 (11th Cir. 2013), the Eleventh Circuit clarified that the McDonnell Douglas framework is not the *sine qua non* for a plaintiff to survive summary judgment in a discrimination case. See Smith v. Lockheed Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011). Instead, "the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." Id. A triable issue of fact exists "if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." Id. (footnote omitted) (internal quotation marks omitted).

## 2.    **Application**[9]

Chase relies on the following evidence to support his claim of age discrimination in his termination. Chase alleges that during his employment, Warehouse Manager Jim Rich and Warehouse Manager Jason Combs, discriminated against him because of his age. Chase alleges that Rich call him "an old man" several times. (Doc. 47-1 at 12 (Dep. Chase at 85)). Additionally, Chase alleges that Combs discriminated against him by "gag-gifting" him a walker with a bow/ribbon and black balloon on it for Christmas in 2005, in front of all the supervisors, to be funny, and there was "laughing and joking" and saying things like "you can get around

---

9 Chase has not asserted that supervisor Jim Rich's "old man" comments support his age discrimination claim. As such, they will not be discussed further here.

24

with this[]" and "here old man, this will help you get around."   Id. at 12-13 (Dep. Chase at 85-89)).   (Doc. 53-8 at 3 (Dep. Kinnaman at 40); Doc. 53-11 at 3 (Dep. Combs at 36)).   Chase alleges that Combs also called him as "an old fart" an "an old man" numerous times over the last several years, before his termination, in front of various supervisors such as Brad Jones, Tommy Ladnier, David Cleary, Harry Smith (an HR manager), and others.   (Doc. 47-1 at 13-14 (Dep. Chase at 93-96)).   Combs testified that he has heard people in the warehouse call Chase "old man," as well as in morning office meetings with warehouse supervisors and elsewhere.   (Doc. 53-11 at 3 (Dep. Combs at 34-35)).   Ladnier testified that "we all have[]" given Chase a hard time about his age and heard Combs joke about it.   (Doc. 47-5 at 1 (Dep. Ladnier at 96)). Chase stated that he never reported what had happened "in order to keep my job and keep harmony[.]"   (Doc. 47-1 at 14 (Dep. Chase at 95)).

Chase has presented no direct evidence to support his claim.   The "old man" or "old fart" comments by Jason Combs over a period of years would not be deemed as such.   While Combs was the Warehouse Manager, he was not a "decision maker" in Chase's termination. Rather, HR Manager LaMont and Operations Manager Thayer made the termination decision. The Eleventh Circuit has held that stray remarks made by non-decisionmakers are not direct evidence of discrimination.   See e.g., Dixon v. The Hallmark Cos., Inc., 627 F.3d 849, 855 (11th Cir. 2010) (applying the Castle rule for direct evidence, finding that direct evidence can be shown through "a scrap of paper saying 'Fire Rollins--she is too old'"); Roberts v. Design & Mfg. Servs. Inc., 167 Fed. Appx. 82, 85 (11th Cir. 2006) (finding no direct evidence of age discrimination, because supervisor "never stated that he was going to fire [the plaintiff] because he was too old"); Van Voorhis v. Hillsborough Cnty. Bd. of Cnty. Com'rs., 512 F.3d 1296, 1300

(11th Cir. 2008) (finding that the statement of a decisionmaker, a manager in charge of hiring, that he "didn't want to hire any old pilots," qualified as direct evidence).

Accordingly, Chase bears the burden of establishing his prima facie case of age discrimination under McDonnell Douglas by proving that: 1) he is a member of a protected class of persons between ages 40-70; 2) he was subjected to an adverse employment action; 3) a substantially younger person filled his position; and 4) he was qualified to do the job. Collins v. Compass Group, Inc., 2013 WL 4433736, *11 (N.D. Ala. Aug. 16, 2013)). The Court is satisfied that Chase has established a prima facie case of age discrimination,[10] and moreover, Ace's motion has presumed such, arguing only that he has failed to overcome its legitimate non-discriminatory reasons for terminating him. (Doc. 48 at 23).

Specifically, Ace contends that it terminated Chase for the following six (6) legitimate non-discriminatory reasons: 1) Chase failed to treat his subordinate employee the same under the Policy as directed by HR Manager LaMont, including his failure to terminate Armstrong for her continuing attendance violations after LaMont issued the fourth corrective action form; 2) Chase's failure to charge Armstrong with numerous attendance violations by excusing the violations during the week in which the violations occurred; 3) Chase's failure to review with Armstrong, and require her to sign, the third and fourth corrective action forms LaMont issued; 4) Chase's *post hoc* submission of an annotated attendance record to HR Payroll Clerk Tysk that appeared to approve multiple attendance violations unrelated to the "MEALMAX" violations Manager Thayer authorized; 5) Chase's insubordinate discussion of Armstrong's attendance with

---

10 Based on a review of the record, evidence supports a finding that Chase is a member of a protected class, as he was age 62 when the alleged age discrimination occurred; he was subjected to an adverse employment action as he was terminated; the parties do not dispute that he was qualified to do the job; and a substantially younger individual was hired to replace him (Tabitha Kinnaman and/or Chris Wilson).

LaMont's subordinates, instead of conferring with LaMont, in an apparent effort to circumvent LaMont's direction to treat all employees the same; and 6) Chase's failure, during his meeting with Manager Thayer while trying to "salvage" Armstrong's employment, to inform Thayer that he had not provided Armstrong with her third and fourth corrective action forms. To rebut Ace's reasons for his termination and survive summary judgment, Chase must present evidence showing that *each* of these 6 reasons are untrue or are pretext for age discrimination. See, e.g., Perry v. Batesville Casket Co., Inc., 2014 WL 53063, *2 (11th Cir. 2014) (providing that "to meet his burden of showing a pretext…the plaintiff must rebut all legitimate non-discriminatory reasons that the employer proffers[]"); Bojd v. Golder Assoc., Inc., 212 Fed. Appx. 860, 862 (11th Cir. 2006) (finding that when multiple reasons "are advanced" a plaintiff must show "each reason was a pretext[]").

Chase has failed to present any evidence that each of the 6 proffered reasons for his termination are untrue and/or pretext. Instead, the entirety of the evidence upon which Chase relies -- to ostensibly support his age discrimination claim and "rebut head on" Ace's proffered reasons -- consists of the following: 1) Ace Warehouse Supervisor Tabathia Kinnaman's testimony that Chase was replaced by Chris Wilson (who was ½ Chase's age); and 2) that Jason Combs called Chase "old man" (and/or "old fart") on a number of occasions over several years and gave Chase a gag-gift of a walker with a black balloon in 2005.[11] (Doc. 53 at 13). Put simply, Chase has failed to show how even one of Ace's proffered reasons for terminating him constitute pretext.

---

11 The Court has not relied upon either Dilin Justus' Affidavit (Doc. 53-9 (Aff. Justus)) and/or Declaration (Doc. 56 at 54-58 (Decltn. Justus)). To the extent that they are helpful to Chase, they merely support Chase's version of what occurred leading up to his termination. Justus' affidavit does not lend any support to the claim that Chase was terminated because of his age.

Moreover, Chase has failed to show that his age was the real "but for" reason.   See, e.g., Perry, 2014 WL 53063, *3 (citing Hicks, 509 U.S. at 515 and Gross, 557 U.S. at 176). Specifically, consideration of Ace's six (6) proffered legitimate non-discriminatory reasons for firing Chase, when compared with Chase's allegations, reveals only what amounts to an employer-employee dispute about what transpired.   If the jury were to believe Ace's version of events, Chase was fired for insubordination, doctoring attendance violation reports, and failing to fire Armstrong as directed.   If the jury were to believe Chase's version of events, he was fired for misunderstanding what he was suppose to do, as he communicated with the appropriate supervisors (or believed that he had), tried to salvage Armstrong's job after conferring with his supervisor (including making notations on attendance violation reports for Thayer or Tysk to review), and understood from HR that only if Armstrong committed another violation after December 20, 2012, should he need to terminate her, and thought he was following instructions.

Notably absent, however, amidst this purported series of misunderstandings and miscommunications as to how Chase handled Armstrong's attendance violations, is any evidence of an age bias against Chase.   In order for Chase to "establish a disparate-treatment claim under the ADEA, [he] must prove by a preponderance of the evidence . . . that age was the 'but for' cause" of Ace's decision to terminate him.   Sims v. MVM, Inc., 704 F.3d 1327, 1332 (11th Cir. 2013) (quoting Gross, supra).   In other words, Chase's "claim 'cannot succeed unless [his] protected trait actually played a role in [Ace's decision] and had a determinative influence on the outcome.'" Id. (quoting Gross at 176).   Thus, even assuming the facts alleged by Chase are true regarding the circumstances of his termination (e.g., that the December 20th meeting with LaMont took place, that LaMont ever gave him the directive to terminate Armstrong, that the

manner in which Chase was fired was unique and had never occurred before (e.g., no prior warnings or meetings), etc.), he has not produced evidence that age was a factor in the decision, much less established that age was the "*but for*" factor in Ace's decision.

Further, the only evidence submitted by Chase about age relates to comments made by a non-decisionmaker (Combs) over a period of several years and the presentation of a walker gag-gift by Combs seven years before his termination. The "old man" comments and gift of a walker by non-decisionmaker Combs -- although perhaps derogatory and inappropriate – have not been related to any extent to Ace's decision to terminate him. As such, this evidence is inadequate to establish evidence of discriminatory intent. See, e.g., Mitchell v. USBI Co., 186 F.3d 1352, 1355 (11th Cir. 1999) (finding that the managers' statements did not constitute circumstantial evidence of discrimination where the managers were non-decisionmakers, especially where the comments were ambiguous); Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1329 (11th Cir. 1998) (concluding that a vague statement indicating possible age bias made by a manager who played no part in a termination decision did not preclude summary judgment in favor of the employer on plaintiff's ADEA claim); Mauter v. Hardy Corp., 825 F.2d 1554, 1558 (11th Cir. 1987) (providing that a company vice president's statement, "The Hardy Corporation was going to weed out the old ones" did not present a genuine issue of material fact as to discriminatory intent when the vice president played no part in the decision to terminate the plaintiff); Bozeman v. Per-Se Tech., Inc., 456 F. Supp. 2d 1282, 1353 (N.D. Ga. 2006) (finding that "statements by…non-decisionmakers unrelated to the decisional process at issue are not sufficient to satisfy the Plaintiff's burden of demonstrating that the defendants' proffered reasons were pretexts for retaliation[]"). In sum, Chase has not presented evidence establishing that age

was the "but for" cause for the adverse employment action taken against him (the termination).

Finally, even discarding McDonnell Douglas, the Court is unable to piece together a "convincing mosaic" (Smith, 644 F.3d at 1328) from the circumstantial evidence on record from which a reasonable jury could infer an unlawful discriminatory intent in Ace's decision.   Chase did not present any evidence tying Ace's termination decision to his age.   See, e.g., Connor v. Bell Microproducts-Future Tech, Inc., 492 Fed. Appx. 963, 967 at n. 1 (11th Cir. 2012) (finding insufficient evidence of age and/or race discrimination under the Smith standard).

As such, Ace's motion, as to Chase's AADEA claim, is due to be **GRANTED.**

IV.   **Conclusion**

Accordingly, it is **ORDERED** that the Defendant's Motion for Summary Judgment (Docs. 47-49) is **GRANTED**.

A Final Judgment consistent with the terms of this Order shall be entered by separate document as required by Rule 58 of the Federal Rules of Civil Procedure.

**DONE** and **ORDERED** this the **7**[th] day of **February 2014.**

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**